IN THE DISTRICT COURT OF THE UNITED STATES

DISTRICT OF SOUTH CAROLINA

FLORENCE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | CRIMINAL NO.: 4:21CR0173-SAL(1) |
| ) | |
| vs. ) | |
| ) | **SENTENCING MEMORANDUM** |
| HART WILLIAM GROW ) | |
| ) | |

      Hart Grow committed terrible crimes against the victims in this case, and on November 29, 2021, Hart William Grow entered pleas of guilty to sex trafficking of a minor in violation of 18 U.S.C. § 1591(a)(1) and (b)(2) and coercion and enticement of a minor in violation of 18 U.S.C. §§ 2251(a) and 2422(b). Hart will be before the court on June 23, 2022, for his sentencing hearing. It will be on this date that Hart will stand before the court and again accept responsibility for his acts as he has always done from the earliest days of this case. He will stand before the court as a twenty-six-year old man, who was married, who had a good career, who was taking college classes to better himself, and who had no criminal record. He will also stand before the court as a convicted sex offender who has committed terrible acts.

      How could something like this have happened? How could someone do this? What was he thinking? These are the typical questions that people have in tragic and awful situations. The answers to these questions are often complex and multi-faceted. Such is the case with Hart Grow.

      The experiences of life shape us all. The presentence report ("PSR") touches on some of Hart's life experiences. This memorandum will address Hart's adverse childhood experiences such as being sexualized at a young age, growing up in an abusive and toxic home environment, suffering from a physical impairment which was a source of ridicule, and being bullied in school.

1

Ultimately, this court bears the responsibility of imposing a sentence that is sufficient but not greater than necessary to (1) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. In determining the particular sentence to be imposed, the court shall consider, among other factors, the nature and circumstances of the offense and the history and characteristics of the defendant and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553.

No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence. 18 U.S.C. § 3661.

Hart's guideline range is (262-327) months imprisonment. This range from top to bottom spans from 21.83 years to 27.25 years. By any measure, this range provides for a significant amount of time in prison. Hart Grow is asking this court to grant a downward variance and impose a sentence of 240 months which equals 20 years.

### Nature and Circumstances of the Offense - 18 U.S.C. § 3553(a)(1)

Hart has pleaded guilty to sex trafficking of a minor and coercion and enticement of a minor. These offenses began when Hart met these minor victims in online BDSM communities. Generally, speaking, if two people become involved in a BDSM relationship, one is typically the dominant participant or "dom", and the other is typically the submissive or "sub". These relationships generally function with clearly established rules, boundaries, and the use of safe

words or actions. While this type of activity may not appeal to everyone, there is nothing wrong with it or illegal about it when such a relationship involves consenting adults. These communities provide an environment where people can participate in fantasy roll-playing.

The BDSM relationships in this case did not involve consenting adults and was totally illegal. The presentence report contains a significant amount of information about the nature and circumstances of this offense. Suffice it to say, these are very serious offenses which had significant impact on the minor victims.

**History and Characteristics of the Defendant - 18 U.S.C. § 3553(a)(1)**

Hart William Grow was born to the parental union of August Grow and Nicole Grow on September 5, 1995, at St. Joseph's Hospital in Phoenix Arizona.

Hart has a maternal half-sister, Amber Carter. Amber is four years older than Hart, and Hart's mother and Amber's father were never married, and Amber's father has never been involved in her life.

When Hart was first born, the family lived in a trailer. When he was two years old, the family moved to a house at 4732 N. 82nd Avenue in Phoenix. At age seven, the family moved around the corner to 8216 W. Highland Avenue from at least when Hart was in the 5th or 6th grade until he was in the 10th grade. While Hart was in High School, the family moved back to the 82nd avenue address where his mother and father still reside.

Hart's father has worked as a truck driver for a glass company, he was in restaurant management, worked for Jiffy Lube, and went back to driving trucks when Hart was about 12-years old. Hart's mother was mainly a homemaker when he was little. His mother has smoked since she was in her early teens and smokes one pack of cigarettes a day. His mother did drink some as well. His mother has diabetes and high blood pressure and cholesterol. His mother also

3

has bad acid reflux, and polycystic ovarian condition. His mother is now on disability, and Hart helped take care of her when her health was declining.

Hart began his formal education at Tomahawk Elementary School which is part of the Cartwright School District in Arizona. He attended Tomahawk Elementary from kindergarten in the 2001-2002 school year through the 3rd Grade in 2004-2005. One of Hart's earliest school records from kindergarten has a notation which characterizes Hart as "tongue-tied" and indicates that Hart needed speech therapy (Exhibit A). Hart indeed had a speech impairment which was not corrected until he was about 13. This speech impairment was a source of ridicule as other students made fun of Hart and bullied him throughout most of grade school.

Hart was raised by abusive parents. Hart discussed his homelife with the U.S. Probation Officer. Paragraphs 160 and 161 of the PSR contain a summary of what it was like in the Grow household. Hart described the relationship as "toxic," and he described some of the violent occurrences in the household. Mr. Grow had a violent temper. Hart never knew from day to day what would set his father off. There were certain events that would make a violent outburst by Mr. Grow more likely. For example, if Mr. Grow had a bad day at work, it would be a bad night at home. If you did not complete all of your chores or if you were being "mouthy," chances were pretty good that Mr. Grow would lose his temper. When Mr. Grow lost his temper, it could get really bad. Mr. and Mrs. Grow yelled, screamed and physically fought each other, and they would also unleash their anger on their children.

Mr. Grow beat both children with a belt, he slapped them in the face, and Hart believes he hit him with a closed fist in the face once. He did hit Hart hard enough that Hart saw stars at least once. Mr. Grow may have been worse on Amber. Hart witnessed his father slap Amber in the face repeatedly. The beatings they received from Mr. Grow were not enough to send them to the

hospital, but the children did have bruises and marks on their bodies from this abuse. Sometimes, as she got older, Amber would fight back. Mr. Grow would just escalate his attacks, and he did not hold back when he was slapping and beating on the children. Ms. Grow has slapped Hart before, but her primary contribution to the family dysfunction was being verbally abusive and unavailable for help from the physical abuse. Mr. and Mrs. Grow yelled at each other all the time, almost nightly. Sometimes, the arguments escalated to the point that Ms. Grow pulled a gun on Mr. Grow and screamed at him to leave. On one occasion, Mr. Grow got so mad he threw the TV down the hall and into the wall which made a hole the Grow's never fixed. The police showed up, and Ms. Grow told the children to lie to the police so Mr. Grow would not have to go to jail. Another time, when Hart was 11 or 12, Mr. Grow lost control when he found out that Amber had not done the dishes. Mr. Grow began yelling and screaming and started breaking dishes. Amber's boyfriend was also in the house, and Mr. Grow picked him up and threw him out of the door. Ms. Grow got the gun and screamed at Mr. Grow to leave.

Amber took her frustration and anger out on Hart from time to time by being verbally abusive to him. She was mean to him and really tried to hurt and upset him with comments like calling him a "stupid motherfucker" and saying, "you aren't my real brother." One time she locked Hart in a closet in the dark.

This abusive family setting was not the only trauma in Hart's live. When Hart was five, his maternal grandmother was babysitting him. He was outside playing with a neighborhood girl who was around four years older than Hart. This girl turned this playtime into a traumatic experience of a sexual nature. She wanted to play "girlfriend and boyfriend." She played this so-called game with Hart in a playhouse in the backyard. The game consisted of her straddling Hart and her grinding her pelvis on him and fondling him. This type of activity went on for some time.

The last time she played the game, the girl inserted a twig in Hart's urethra. This was extremely painful for Hart, both physically and emotionally. Hart told her that he did not want to play anymore, but the girl wanted to keep playing. Hart's sister Amber walked in on them, and that was the end of the game. Hart told his grandmother about the incident. Afterward, he did not go to his grandmother's house for years. His grandmother had been an important figure in his life, and she was suddenly gone. Hart believed this was his fault, and he felt guilty. Hart talked about this incident during his presentence report interview. Paragraph 170 addresses this incident.

At age eight, Hart remembers seeing pornography for the first time when he clicked on a file his father had recently viewed. A pornographic video began playing. This experience created Hart's initial curiosity in pornography. This initial interest would expand and intensify over the years to come. While all of this was happening, Hart was trying his best in school. However, school became more difficult for Hart when the level of bullying he experienced increased.

From the available school records, Hart was consistently an A and B student. Before he started the 4th grade, Hart's family decided to try and move him into the Peoria area school system which is now called the Peoria Unified School District. Both Hart and has half-sister, Amber, attended Cotton Boll Elementary School which had K through 8th Grade. Amber was in the 8th Grade, and Hart started Cotton Boll in the 4th Grade. After about a month in Ms. Dominguez's 4th Grade class, the school determined Hart was beyond the 4th Grade curriculum and promoted him to the 5th Grade. However, Hart's overall experience at Cotton Bowl was bad. Although Hart had been bullied beginning in the 1st Grade, this mainly consisted of being picked on for being different by the largely Hispanic population of the school, and for having a speech impediment. At Cotton Bowl, he experienced a higher level of bullying for the first time. Two boys, Nathan and Louie bullied Hart by cornering him and intimidating him. They would push him around, make fun of

him, and threaten him. After a year of this type of treatment, and with no help from the school to stop it, Hart returned to Tomahawk Elementary for the 2006-2007 school year as a 6th grade student. Amber also left Cotton Boll. Hart turned 11 at the beginning of this school year. Around this time, a classmate told Hart about a pornographic website which resulted in Hart looking at pornography on his own initiative.

After Tomahawk Elementary, Hart went to Estrella Middle School. In the 8th Grade, Hart developed a crush on a girl named Ashley. He asked her if she thought he was ugly, and she said "yes!" This experienced only contributed to Hart's negative self-image.

Hart had more problems with bullying at Estrella Middle School. The PSR states that Hart developed acid reflux from the stress of being bullied and the yelling and abuse at home. His attendance records from Estrella Middle show that he was seen by the nurse or missed school for stomach problems on one occasion and for vomiting on another (Exhibit B). Hart suffers from asthma which was the root of some of his sick days or nurse visits. There were others where he missed school or saw the nurse for an unspecified illness. Around age 14 or 15, Hart began viewing pornography at least once a week

For the 9th Grade, Hart was supposed to start at North High School. However, Hart started the pre-IB program which required him to go to school in Phoenix. You had to complete the pre-IB program in 9th and 10th grade to be admitted into the IB program as an upperclassman. The family could not afford to drive him, so Hart had to take the bus. It was an hour and a half bus ride to school. Because of the pre-IB curriculum, Hart had eight classes when ended about 3:40 every day. When he got home, he had three to five hours of homework to complete every night. After about a month of this grind, Hart dropped out of the program.

At this time, Hart's maternal grandfather developed viral spinal meningitis, and Hart and his mother moved to Ohio to help take care of him. Hart went to school at Huber Heights. There he encountered a kid named Brad who had recently hospitalized another boy and was in trouble in the juvenile system. Brad wore an ankle monitor to school. Brad got mad at Hart over a girl named Maggie. Brad threatened to hurt Hart. Brad told him he could put him in the hospital too. Hart recorded some of these threats with his phone. Brad tried to get the phone from Hart, but he couldn't. The school told Hart that they could not guarantee his safety. After a month or so, Hart and his mother returned to Arizona. Hart finished up the 9th grade at Trevor Browne High School.

Not surprisingly, Hart's school records show that his grades fell off dramatically during this time. He made F's and C's during his time in Ohio, and he made similarly bad grades for the remainder of his 9th grade year at Trevor Browne (Exhibit C)

After a semester of Primavera Online school to start the 10th Grade, Hart finished his high school career at Trevor Browne where he was able to get back on track academically and graduate in the middle of his class in 2013 (Exhibit D). During the end of high school, the family moved back to the house on N. 82nd Avenue. The home computer was in Hart's room. This gave him the opportunity to view pornography more often. It was during this time that Hart became interested in and began participating in online BDSM communities.

Heart finished Estrella Community College where he did well academically. Hart was admitted into The National Society of Collegiate Scholars, and he was inducted into Phi Theta Kappa Honor Society (Exhibit E). He became a licensed pharmacy technician and worked for CVS for three years (Exhibit F). At CVS, he would help fill prescriptions and, after being verified by the pharmacist, would hand the customers their medicine. Hart got a better job and went to work for the pharmacy division of Humana. Humana was a pharmacy by mail, and Hart's job was

8

to answer basic questions from customers over the phone. For more complicated questions, customers would be referred to a pharmacist. Hart was attending Grand Canyon University where he made the Dean's List on January 20, 2021 (Exhibit G).

Hart enjoyed his career. He chose the medical profession because he enjoyed helping people. Hart also loves animals, especially cats. He bottle-fed an abandoned cat he named "Baby" that he found soon after birth. He had Baby for around 9 years. Hart participated in "Fallen Feathers" which is nonprofit organization that is wildlife rescue and relocation facility in addition to an exotic bird rescue. He did this with his mother. Mrs. Grow still supports her son as indicated in her attached letter (Exhibit H).

Despite Hart's poor self-image and social awkwardness, he met Sierra Bolton. They began a relationship and got married in 2020. Together, they participated in HALO, which stands for "helping animals live on." Hart also worked with St. Mary's food bank. All of this, Hart's career, and his marriage, came to an end when Hart was arrested for his crimes.

The sad reality is that Hart's successes in life and attempts to overcome the hardships of this life were inextricably intertwined with a significant amount internet pornographic activity. During Hart's upbringing, he developed an extremely poor self-image, he suffered from depression and anxiety which went untreated. He was largely a social isolate. Over the years Hart used pornography as an escape from his miserable homelife and school experiences. Pornography provided him with some measure of joy where there otherwise was none for him. However, Hart's involvement with pornography and participation in online BDSM communities spiraled out of control and crossed the boundaries been legality and illegality.

Hart knows what he has done is terribly wrong, and that he has inflicted serious mental anguish and suffering on others. For this, he is profoundly sorry and remorseful.

**The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, Afford Adequate Deterrence, Protect the Public from the Defendant, and Provide the Defendant with Needed Correctional Treatment – 18 U.S.C. § 3553(a)(2)**

Hart is asking this court to impose a twenty-year sentence. A 20-year sentence reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence, and protects the public from Hart.

Hart's guideline range is 262-327 months. Hart has not yet turned 27 years old. Because defendants are eligible for an amount of good-time that equates to them serving 85% of their sentence, a 20-year sentence would require Hart to serve a minimum of 204 months in a Bureau of Prisons institution. 204 months is 17 years. Hart has already been in jail for about 13 months, and he would receive credit for this time. With a 20-year sentence, the least amount of time Hart will serve in prison is 191 months which is one month shy of 16 years. In 16 years, Hart will be 42 years old. If Hart receives a 20-year sentence, he will spend more than half the amount of time that he has been alive in prison.

The government cites *United States v. Sarras*, 575 F.3d 1191, 1220 (11th Cir. 2009) as to the reasonableness of a 100-year sentence. Certainly, there are examples of very high sentences, and there are examples of comparatively low sentences in similar cases. *United States v. Liwanag*, 372 F. Supp. 3d 68 (E.D.N.Y. 2019) is such a case. Keith Liwanag was 27 years old when he was sentenced for sexual exploitation of a child. This defendant communicated over the internet with women in the Philippines to engage in lewd sexual conduct with children for money. The defendant watched this conduct, some of which he directed. One of the minor victims was six years old. The defendant recorded some of these interactions and posted some on the internet for others to view. This defendant had a criminal history category of I. His offense level was 43.

This produces a guideline range of Life imprisonment. The defendant faced a 30-year maximum sentence. The district court imposed a 15-year sentence. The government did not appeal.

Every case stands on its own for sentencing purposes. A district court must conduct "an 'individualized assessment' of the facts and arguments presented." *United States v. Blue*, 877 F.3d 513, 518 (4th Cir. 2017) (citing *Gall*, 552 U.S. at 50). An individualized assessment means that the district court must "consider the defendant's nonfrivolous arguments for a downward departure, impose an individualized sentence based on the characteristics of the defendant and the facts of the case, and explain the sentence chosen." *Id.* "The adequacy of the sentencing court's explanation depends on the complexity of each case" and the facts and arguments presented. *Id.*; *see Chavez-Meza v. United States*, 138 S. Ct. 1959, 1964, 201 L. Ed. 2d 359 (2018).

The U.S. Sentencing Commission produces a "sourcebook" every year which compiles their collected sentencing data from all over the country. This is the U.S. Sentencing Commission's data for months imprisonment in sexual abuse cases for fiscal years 2018 through 2021 nationally (Exhibit I).

|      | Number of cases | Mean | Median |
|------|-----------------|------|--------|
| 2021 | 1,057           | 212  | 180    |
| 2020 | 877             | 202  | 180    |
| 2019 | 1,158           | 206  | 180    |
| 2018 | 1,053           | 193  | 180    |

Of course, sentences above and below these numbers combine to produce the average and midpoint sentences. Of note, the number of sex abuse cases seem to be pretty consistent during this four-year period.

It is not necessary to impose a sentence higher than 20 years to provide adequate deterrence. In fact, the increasing length of a sentence has been shown to have little deterrent effect. Even the death penalty has not been conclusively shown to be a deterrent to murder. What does have a deterrent effect is the certainty of punishment.[1] A sentence of between 20 years and the top of Hart's guideline range would provide no additional deterrence. This measure of deterrence has to do with the length of a sentence deterring others from committing the same crime.

The U.S. Sentencing Commission equates recidivism with deterrence. Recidivism has to do with a defendant committing crimes after release from prison. Protecting the public from further crimes of the defendant is another 3553(a) factor which the court must consider.

The U.S. Sentencing Commission's research concludes that there is a deterrent effect for sentences longer than 120.[2] According to this research, offenders incarcerated for more than 120 months are less likely to recidivate eight (8) years after release. There were two models in the study with larger sample sizes, offenders with more than 10-year sentences were approximately 30% less likely to recidivate than offenders with lower sentences. In a third model, offenders with more than a 10-year sentence were 45% less likely to recidivate than offenders serving lesser sentences. For the offenders sentenced to more than 120 months, the average sentences were around 170, 140, and 125 months. Across all groups, sentences of more than 120 months had a deterrent effect.

However, it simply does not follow that deterrent effect keeps increasing and rates of recidivism keep dropping as sentences increase. At some point beyond 20 years, a defendant's sentence merely serves to punish and incapacitate the defendant and becomes greater than necessary to comply with the dictates of 18 U.S.C. § 3553.

---

[1] Five Things About Deterrence, National Institute of Justice, June 5, 2016
[2] U.S. Sentencing Commission, Length of Incarceration and Recidivism, April 29, 2020.

It is well known that the older a person is, the lower their risk to recidivate upon release. Hart will be over forty (40) when he is released. He will be at a lower risk to recidivate based on that alone. Hart needs treatment while in the Bureau of Prisons. This is the primary corrective that Hart needs. With such court-ordered or recommended treatment prior to the time Hart is released from the institution and as part of supervised release, he will be at a lower risk to recidivate. Further, and even though Hart orchestrated the contact offense which occurred in this case, Hart is technically a non-contact offender. All of the evidence in this case suggests that without the internet as a vehicle, Hart Grow would not be a sex offender. As part of supervised release, which may be for the rest of Hart's life, there will be controls placed on any computer he may use to prevent this type of behavior from occurring. He will also have to register as a sex offender for life which will alert the community to his presence. As an additional part of supervised release, Hart will take polygraph examinations. The point being, incarcerating a defendant for an extremely long time is not the only way to protect the public from further crimes of a defendant.

Given the lack of any demonstrable increased deterrent effect from sentences over 20 years, sentences well over 20 years do very little to promote respect for the law. Punishment that is fair is appropriate and promotes respect for the law. Punishment simply for the sake of punishing someone is not the measure by which fairness is gauged. A punishment is just insofar as it fits the crime. *See Simon v. United States*, 361 F. Supp 2d 35, 43 (E.D.N.Y. 2005)(quoting *United States v. Wilson*, 350 F. Supp. 2d 910, 916 (D. Utah 2005)). Just punishment cannot simply be the most severe punishment available. If so, maximum sentences would be the norm.

**The Need to Avoid Unwarranted Sentencing Disparities - 18 U.S.C. § 3553(a)(6)**

Imposing a 240-month sentence would not create unwarranted sentencing disparity. However, if the court is disinclined to grant that much of a downward variance or no variance at all, it may be useful to examine some more data from the U.S. Sentencing Commission that directly bears on sentencing in child pornography production cases.[3]

This report examined the sentences of 512 offenders. The mean sentence for these offenders was 275 months.

The Commission broke this research down into several factors that appeared to affect sentencing outcomes. One factor is the relationship to the victim. For a parent, the mean sentence was 340 months and 304 for other relative. For a teacher, coach, etc., the mean sentence was 274 months. The mean sentence for an internet stranger was 249 months.

With regard to the age of the victims, the mean sentences are higher for younger victims. For a teenage victim, the mean sentence was 232 months. By comparison, the mean sentence for an infant victim was 364 months.

With regard to sexual contact being involved in the production of child pornography, the mean sentence was 307 when the offender or co-participant sexually contacted a victim.

Incapacitation, coercion, enticement, or misrepresentation were also one of the factors examined in the study. The mean sentence for incapacitation of a victim was 313, the mean sentence for coercion was 291, the mean sentence for misrepresentation was 288, and the mean sentence for enticement was 277.

For offenders engaged in other child pornography conduct, the mean sentence was 289 if the defender was engaged in other non-production child pornography.

---

[3] Federal Sentencing in Child Pornography Production Cases, U.S. Sentencing Commission 2021.

**The Kinds of Sentences Available - 18 U.S.C. § 3553(a)(3)**

The only kind of sentence realistically available to Hart is a lengthy term of imprisonment. As stated before, the Bureau of Prison's policy will require Hart to serve 85% of his sentence at a minimum. The type of institution Hart will serve his sentence in depends upon a security point score combined with certain public safety factors. One public safety factor is when a defendant has more than 20 years remaining on his sentence. Bureau of Prisons policy requires any defendant with more than 20 years remaining on his sentence to be designated to a Medium Security prison.

It is widely known that sex offenders are typically subject to maltreatment in prison. The court referenced this is *Liwanag*. The court noted that "the seriousness of the defendant's offense will likely result in an unsafe and challenging environment in prison. Sexual assault offenders are often at risk of violence at the hands of other inmates, since they are a "disfavored" group within prison populations. *See* Alice Ristroph, *Sexual Punishments*, 15 Colum. J. Gender & L. 139, 159-60 (2006)." "Prisoners will often go to great lengths to injure or even kill sex offenders, especially those who have committed crimes against children." Dennis Giever, *Jails in Prisons Today and Tomorrow* 414, 448 (Joycelyn M. Pollock el., 1997).

With this in mind, the court could sentence Hart to more than 20-years without Hart having more than 20 remaining on his sentence when the Bureau of Prisons designates him. For a 275-month sentence, Hart would have to serve 233.75 months. In this situation, he would not have more than 20-years remaining on his sentence, and he would be able to avoid designation to a Medium Security facility.

## **CONCLUSION**

Based on all of the reasons discussed herein and for any additional information placed on the record during the sentencing hearing in this matter, Hart William Grow respectfully requests

that this Honorable Court grant a downward variance to a sentence of 240 months, or in the alternative, a sentence of no more than 275 months.

                Respectfully submitted,

                /s/ MICHAEL A. MEETZE
                Assistant Federal Public Defender
                c/o McMillan Federal Building
                401 W. Evans Street, Suite 105
                Florence, South Carolina 29501
                Telephone: (843) 662-1510
                **Attorney ID#: 6662**

Florence, South Carolina

June 16, 2022